## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| BETTER WAY FORD, LLC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Docket No. 2:21-cv-00116-NT |
| | ) |
| FORD MOTOR COMPANY, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION TO DISMISS

Before me is Defendant Ford Motor Company's Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 50). For the reasons stated below, the motion is **GRANTED**.

## FACTUAL BACKGROUND[1]

This case involves a decade-long family dispute over the Cianchette family's ownership of a Ford dealership, Casco Bay Ford. I summarize it below.

---

[1] The facts below are largely drawn from the allegations in the Amended Complaint (ECF No. 39), which I take as true for the purpose of deciding the motion to dismiss. *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021). I "may also consider documents attached to the Amended Complaint or incorporated by reference therein." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 54 F.4th 42, 48 (1st Cir. 2022). In addition, I consider the documents attached to the parties' briefing on the motion to dismiss. "Ordinarily, [on a motion to dismiss,] a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). There are, however, narrow exceptions "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim[s]; or for documents sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). Moreover, while I must accept well pleaded facts, to the extent the allegations in the Amended Complaint contradict documentary evidence properly before me, I need not adopt the Plaintiffs' asserted facts and may make factual findings in accordance with the documentary evidence. *Bray v. Worcester Polytechnic Inst.*, 596 F.Supp.3d 142, 147 n.2 (D. Mass. 2022); *see Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014).

## I.  The 2013 Transaction

For over twenty-five years, Arthur McLeod owned Casco Bay Motors, Inc., which owned Casco Bay Ford. Am. Compl. ¶ 45 (ECF No. 39). In 2013, McLeod decided to sell the dealership and its related real estate holdings. Am. Compl. ¶ 45. One potential buyer was Tucker Cianchette, who then worked as a manager at Casco Bay Ford. Am. Compl. ¶ 47. However, Tucker[2] could not afford to purchase the dealership on his own. Am. Compl. ¶ 47.

Defendant Ford Motor Company ("**Ford**") reserved the authority to approve owners of its franchised dealerships and required that prospective purchasers meet a variety of standards, including strict capital requirements. Am. Compl. ¶ 38. To meet these requirements, Tucker asked his father, Plaintiff Eric Cianchette, and his stepmother, Plaintiff Peggy Cianchette, to partner with him. Am. Compl. ¶ 48. Tucker proposed to manage and operate the dealership if Eric and Peggy would invest or personally guarantee the required capital. Am. Compl. ¶ 49. Eric initially opposed the idea because he was concerned about the financial commitment and Tucker's ability to successfully run the business. Am. Compl. ¶ 50. Eric eventually decided to

---

Most of the documents the parties have provided are copies of depositions, court filings, trial testimony, and opinions from matters before Maine state courts and the Maine Motor Vehicle Franchise Board (the "**Board**") related to the dispute in this case. These types of documents are relevant public records and their authenticity has not been disputed, so I consider them for purposes of the motion to dismiss. The Defendant also attached a Sales and Service Agreement between it and Plaintiff PET, LLC ("**PET**") and a 2015 Letter of Understanding to Tucker Cianchette. I consider the Sales and Service Agreement because its authenticity is not disputed and it is central to the Plaintiffs' claims. *See* Am. Compl. ¶¶ 210–11, 213–16, 218–20. I consider the Letter of Understanding because its authenticity is not in dispute and it is sufficiently referred to in the Amended Complaint. *See* Am. Compl. ¶¶ 94, 117, 131(b), 158, 188, 192.

[2]    Because several of the people in this case share the same last name, I refer to them by their first names.

pursue the project under an agreement that gave Peggy management and operational control over the dealership. Am. Compl. ¶ 51. PET, LLC ("**PET**") was a Maine limited liability company owned by the three Cianchette family members. Am. Compl. ¶¶ 3, 18. Peggy, Eric, and Tucker planned to use PET to purchase Casco Bay Ford. Am. Compl. ¶¶ 3, 52, 54. The membership interests of PET were allocated 34% to Eric and 33% each to Peggy and Tucker. Am. Compl. ¶ 59.

Before approving PET as the new owner of Casco Bay Ford, Ford performed a due diligence investigation. Am. Compl. ¶ 52. As part of the investigation, Ford analyzed whether PET and its members met the "Four Cs": "Capital," "Character," "Capacity," and "Customer Satisfaction." Am. Compl. ¶ 39 & Ex. A (ECF No. 39-1). As far as capital, Ford told PET that it required "that the debt to equity ratio[3] of the proposed dealership not exceed 1:1. Any form of 'Goodwill' or 'Blue Sky' must be paid by the buyers with 100% unencumbered funds. This standard is rigid and must be adhered to in all cases." Am. Compl. ¶ 40. Ford's wholly-owned subsidiary, Ford Motor Credit Company ("**FMCC**"), also required that purchasers secure and personally guarantee the floor plan financing[4] needed to operate a dealership. Am. Compl. ¶¶ 3, 27, 46, 60.

Ford also required two agreements. First, PET and its members had to execute a sales and service agreement. *See* Ford Sales & Service Agreement ("**2013 SSA**")

---

[3]    Ford defined the debt-to-equity ratio as "[t]he amount of borrowed capital compared to the dealer's invested capital." Am. Compl. ¶ 80.

[4]    Floor plan financing is the financing that dealerships use to obtain inventory from vehicle manufacturers like Ford. Am. Compl. ¶ 42.

(ECF No. 65). Second, PET had to sign a floor plan financing agreement with FMCC that required Eric to personally guarantee PET's indebtedness to FMCC, which could exceed $10 million. Am. Compl. ¶¶ 49, 60, 65.

Although Eric would not be involved in the day-to-day operations of Casco Bay Ford, he contributed the capital to PET for the acquisition of the dealership. Am. Compl ¶ 54. Knowing that Tucker could not meet the capital requirements himself, Ford asked Peggy and Eric to ensure that Tucker received some membership interest in PET so that he would have a personal stake in the dealership's success. Am. Compl. ¶¶ 55–58.

On December 9, 2013, with Ford's approval, PET purchased Casco Bay Motors, Inc.'s assets, including its goodwill and the "Casco Bay Ford" trade name for about $5.3 million. Am. Compl. ¶ 61. Concurrently, Plaintiff Cianchette Family, LLC, whose sole members were Eric and the First Cianchette Family Irrevocable Trust, purchased the associated real estate for $2.8 million and became PET's landlord. Am. Compl. ¶¶ 23, 62.

## II.   The Failed 2015 Transaction

In 2015, Tucker asked Peggy and Eric if he could purchase their interests in PET and the dealership real estate (the "**2015 Transaction**"). Am. Compl. ¶ 64. Eric doubted Tucker's ability to successfully run the business and to meet Ford's capital requirements,[5] but Eric was persuaded to agree to the buy-out if he and Peggy could recoup their investment and no longer personally guarantee any part of the business.

---

[5]     Peggy also doubted Tucker's ability to meet the capital requirements. Am. Compl. ¶ 66.

Am. Compl. ¶¶ 65–67. On November 16, 2015, Tucker entered into two Purchase and Sale Agreements—one to acquire Peggy and Eric's PET membership interests (the "**Membership Purchase Agreement**") and the other to acquire the dealership real estate owned by Cianchette Family, LLC (the "**Real Estate Contract**"). Am. Compl. ¶ 68.

The closings for the Membership Purchase Agreement and the Real Estate Contract were contingent upon each other, and a December 15, 2015 Purchase & Sale Contingency Agreement contained additional contingencies as well. Am. Compl. ¶ 69. One condition was that Ford had to approve the Membership Purchase Agreement. Am. Compl. ¶ 71. Another condition was that Tucker had to provide Eric a release from his personal guaranty to FMCC. The December 15, 2015 Purchase and Sale Contingency Agreement also allowed Eric and Peggy to walk away from the deal if they were not satisfied with the financing. Am. Compl. ¶ 70.

Tucker worked closely with Ford's manager/agent Ann McDonough to try to get Ford's approval. Am. Compl. ¶ 72. McDonough prepared a "Sales and Profit Forecast" worksheet to analyze the Membership Purchase Agreement that included calculations of total current assets and liabilities based on PET's monthly financial statements.[6] Am. Compl. ¶¶ 73–74, 81, 83. The forecast showed that the required working capital, total operating investment, and total dealership investment of PET would be $1,364,225 should the membership purchase occur. Am. Compl. ¶ 88. Tucker

---

[6]     The October 2015 PET Dealership Financial Statement showed a total net book equipment asset value of $167,709 and $3,178,632 in unamortized goodwill that PET acquired from Casco Bay Motors, Inc. Am. Compl. ¶¶ 84–85.

proposed financing the membership purchase agreement with a $5 million loan from Androscoggin Savings Bank to PET (the "**Androscoggin Loan**"). Am. Compl. ¶ 89. This loan would have created more debt than equity in PET, and a debt-to-equity ratio over 1:1 would not have passed muster under the "Capital" standards Ford enforced when PET bought Casco Bay Ford in 2013. ¶¶ 39–40, 89–91.

## III.   Ford's Representation to Tucker That He Could Pledge His Membership Interest in PET as Collateral for the Androscoggin Loan

Around November 19, 2015, McDonough directed Ford employee/agent Wendy Avery to email Tucker about the Membership Purchase Agreement. Am. Compl. ¶ 92. Avery explained that she needed to review information to make sure Tucker was not pledging his membership interest in PET as collateral for the Androscoggin Loan. Am. Compl. ¶ 93.[7] On December 4, 2015, Avery emailed Tucker a document entitled "finalLOUCascoBay Ford.pdf." Am. Compl. ¶ 94. In the Letter of Understanding – Term Agreement ("**LOU**"), dated December 3, 2015, Ford "approved a Term Agreement contingent upon [Tucker's] acceptance and execution of this Letter." Mot. to Seal Ex. 3, at 70 (ECF No. 56-4).

On January 27, 2016, Sean Rankin of Androscoggin Savings emailed Tucker stating that he required verification from Ford that Tucker would be permitted to pledge his membership interest in PET as collateral for the Androscoggin Loan. Am. Compl. ¶ 95. Tucker discussed the pledging issue with FMCC manager/agent Vince Talia, who said such a pledge "will be fine." Am. Compl. ¶¶ 96–97. According to the

---

[7]      McDonough testified at trial that Avery incorrectly referred to the transaction as an ownership change, when it was not. Am. Compl. Ex. D, at 20:16–21:21 (ECF No. 39-4).

Plaintiffs, this assurance was incorrect because Ford does not permit its dealers to pledge control of a dealership or a dealership's "goodwill" as collateral. Am. Compl. ¶ 98.

## IV. Ford's Representation That It Was Releasing Eric's Guaranty of PET's Floor Plan Financing

Ford and FMCC knew that the Membership Purchase Agreement and the Real Estate Contract required Tucker to obtain a complete release of Eric's guaranty of PET's floor plan financing (the "**Release Requirement**"). Am. Compl. ¶¶ 99–100. Around December 17, 2015, FMCC employee/agent Angela Story gave Peggy an unsigned letter from Talia purporting to release Eric's liability ("**Guaranty Termination**"). Am. Compl. ¶ 101. Story told Tucker that the Guaranty Termination was sufficient to meet the Release Requirement. Am. Compl. ¶ 102. But the Guaranty Termination, by its plain terms, would not have released Eric's extant liability to FMCC. Am. Compl. ¶¶ 103, 105. FMCC represented to Tucker that the closing would happen and the Release Requirement would not be an impediment. For example, on December 14, 2015, Story emailed Tucker notifying him that he was "approved lines with Ford Credit!" Am. Compl. ¶ 106.

Just before the scheduled closing in January of 2016, Eric and Peggy realized that Eric would still be on the hook for the floor plan financing and that the terms of the Guaranty Termination were narrower than they were led to believe. Am. Compl. ¶¶ 107, 109–10. They decided not to close the deal and could not agree on new terms with Tucker. Am. Compl. ¶ 107–08.

Tucker was furious and thought that Peggy and Eric decided not to close for no reason whatsoever. Am. Compl. ¶¶ 112–13. Although Peggy and Eric tried to explain that they decided not to close because of the Release Requirement, their potential liability, and Tucker's inability to meet Ford's capital requirements, Tucker did not believe them because Ford/FMCC employees had told him he could meet the capital requirements and the Guaranty Termination met the Release Requirement. Am. Compl. ¶¶ 114–15. In 2016, Tucker filed a lawsuit against Peggy, Eric, PET, and Cianchette Family, LLC (the "**2016 Lawsuit**") and cut off all family ties with Peggy and Eric. Am. Compl. ¶ 116.

## V.    Ford's Role in the 2016 Lawsuit

On December 22, 2017, McDonough provided an affidavit in connection with the 2016 Lawsuit, which she swore Ford authorized her to give. Am. Compl. ¶ 121 & Ex. C ¶ 3 (ECF No. 39-3). She also swore that "Ford approved Tucker's proposed purchase of Peggy and Eric's membership interests in PET." Am. Compl. ¶ 123 & Ex. C ¶ 6. McDonough wrote that, because the 2015 Transaction was a membership interest purchase and Ford treated it as an amendment, "Ford did not require Tucker to reflect any goodwill on the books because it was already reflected in the price of the membership interests being acquired." Am. Compl. Ex. C ¶ 6. She also swore that she told Peggy and her lawyer on February 29, 2016, that Ford had approved the purchase, that the LOU with Tucker would be effective following the closing, and that, because the deal was a membership interest purchase not an asset purchase, "there was no requirement that PET's goodwill remain unencumbered" and PET would satisfy Ford's debt-to-equity guidelines with the Androscoggin Loan. Am.

8

Compl. Ex. C ¶¶ 9–10. The court in the 2016 Lawsuit relied on the affidavit to exclude an expert from testifying that there was no evidence that Ford approved the 2015 Transaction. Am. Compl. ¶ 125.

McDonough also testified at the trial for the 2016 lawsuit. Am. Compl. ¶ 126. She said that Ford authorized her to testify. Am. Compl. ¶ 126. She described the 2015 Transaction as an amendment and testified about Ford's process in considering requests for an amendment. Specifically, Ford

> ask[s] for the—the letter to be from the dealer on dealership letterhead, signed by somebody with managerial authority. We then reach out to the candidate and we ask them for corporate minutes, any loan documents, any new lease documents. We also review all of the performance metrics at that time to make sure that the dealership is performing at or above group on the key metrics that we measure.

Am. Compl. ¶ 128 & Ex. D 727:4–727:11.

McDonough further testified multiple times that Ford had approved Tucker's purchase of Eric and Peggy's membership interests in PET. Am. Compl. ¶ 131. For example, McDonough testified that:

- "After going through its analysis," Ford "approved the amendment" and "notif[ied] Tucker that he had been approved." Am. Compl. Ex. D 729:24–730:5 (ECF No. 39-4).

- Ford retail network specialist Wendy Avery sent a December 4, 2015 email "[t]o let Tucker know that he had been approved" and forwarded "the original [LOU] and superseding sales and service agreement for [Tucker's] signature." Am. Compl. Ex. D 730:15–731:12.

- "Ford approve[d] Tucker Cianchette for the purchase of Peggy and Eric's membership interest" and that this "approval was effective on December 7, 2015." Am. Compl. Ex. D 736:20–736:24.

- She was surprised that the deal did not close because Ford "approved [the amendment] so [she] assumed that [the purchase] would go through." Am. Compl. Ex. D 742:2–742:10.

9

- She "satisf[ied] [her]self that all of the requirements were met in order to issue an approval" for the purchase of membership interests. Am. Compl. Ex. D 772:19–773:10.

Similarly, McDonough testified about what was left for Ford to do before the deal could close after it approved the 2015 Transaction on December 7, 2015. Am. Compl. ¶ 133. When asked if there was "anything else necessary besides the closing in order for Ford to sign the [LOU] and finalize the approval," McDonough said no. Am. Compl. Ex. D 737:7–737:10. She further explained that her statement in a March 29, 2016 email that "[e]verything on Ford's end is complete" meant that "in order for [Ford] to execute the amendment, [Ford was] ready to go but [McDonough] needed to know that they had closed." Am. Compl. Ex. D 741:15–741:22.

During her testimony, McDonough also said she knew that Tucker was pledging his membership interest in PET as collateral for the loan with Androscoggin Savings Bank. Am. Compl. ¶ 135; Am. Compl. Ex. D 765:19–767:6; 774:8–774:15.

On March 5, 2018, a jury returned a multi-million-dollar verdict in favor of Tucker. Am. Compl. ¶ 137. The jury found for Tucker on his claims for breach of the Membership Agreement and two other agreements, fraudulent misrepresentation, and breach of fiduciary duty. Ford Motor Company's Mot. to Dismiss Pls.' Am. Compl. ("**MTD**") Ex. D ¶¶ 17–18 (ECF No. 50-4); *Cianchette v. Cianchette*, No. CV-16-249, 2018 WL 3732407 (Me. Super. Ct. June 12, 2018). The Law Court upheld the verdict, and the United States Supreme Court denied Peggy and Eric's writ of certiorari appealing that decision. Am. Compl. ¶ 138; *Cianchette v. Cianchette*, 140 S. Ct. 469 (2019).

## VI.   Peggy and Eric's Further Dealings with Ford

After their unsuccessful appeal, Peggy and Eric received a declaratory judgment from the Maine Superior Court and removed Tucker as owner of the dealership by merging PET into a new company, Plaintiff Better Way Ford, LLC[8] ("**Better Way Ford**"). Am. Compl. ¶ 139. As with the attempted 2015 Transaction, Ford had to approve the Better Way Ford merger as an amendment. Peggy and Eric were shocked to find out that Ford and FMCC were requiring them to meet the stringent capitalization requirements that Ford claimed at trial it did not enforce. Am. Compl. ¶¶ 140–41. On August 18, 2018, Ford requested that Better Way Ford sign a letter with the subject line "Dealership Management Assertions" (the "**Assertions Letter**"). Am. Compl. ¶ 141. The Assertions Letter again described Ford's capitalization requirements and forbid the dealership from "giving any lender or security holder the right to exercise their remedies in any way which would result in the lender assuming ownership or management control of the dealership." Am. Compl. ¶¶ 142–43.

## VII.   The 2022 Proceeding

On April 8, 2021, Better Way Ford, Eric, and Peggy filed a Complaint with the Maine Motor Vehicle Franchise Board (the "**Board**") alleging Ford and FMCC violated 10 M.R.S. §1174 of the Maine Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers Act, 10 M.R.S. §§ 1171 to 1190-A ("**Dealers Act**"). MTD Ex. E (ECF No. 50-5). They alleged that "Ford engaged in an arbitrary,

---

[8]    Peggy and Eric are currently the sole members of Better Way Ford. Am. Compl. ¶ 22.

bad faith, and unconscionable course of conduct related to" the 2015 Transaction and subsequent litigation. MTD Ex. E ¶ 124. They further asserted that "Ford discriminated and used unreasonable, arbitrary, and unfair performance standards related to" the 2015 Transaction and the ensuing litigation. MTD Ex. E ¶ 126.

McDonough again testified, first in a deposition and then in a hearing before the Board. Am. Compl. ¶ 145. The Plaintiffs highlight several of McDonough's statements, which they believe demonstrate that McDonough's previous trial testimony was false. Am. Compl. ¶ 146. The alleged falsehoods fall into four categories: (1) McDonough's omission at the trial of details about the process for approving the 2015 Transaction; (2) false claims as to whether Ford "authorized" McDonough's affidavit and trial testimony; (3) testimony that Ford had "approved" the 2015 Transaction; and (4) testimony involving whether Tucker could pledge his PET membership interest as collateral for the Androscoggin Loan.

Following the hearing, the Board issued a unanimous decision finding that Ford had not violated Section 1174. MTD Ex. F (ECF No. 50-6). An appeal is now pending before the Maine Business and Consumer Court, with the docket number BCD-APP-2023-00005.

## PROCEDURAL HISTORY

On February 10, 2021, the Plaintiffs sued Ford and FMCC in the Maine Superior Court, Cumberland County. Compl. & Summons (ECF No. 5-2). On April 30, 2021, FMCC removed the case to this Court with Ford's consent. Notice of Removal (ECF No. 1). On May 10, 2021, this Court entered a stay until the conclusion of proceedings before the

Board. Order Granting Stay (ECF No. 8). On July 13, 2023, while the stay was still in place, the Plaintiffs filed their Amended Complaint, removing FMCC as a defendant.

The Amended Complaint asserts seven counts against Ford. In Count I, Better Way Ford, Peggy, and Eric assert a violation of the Dealers Act, 10 M.R.S. § 1174. Am. Compl. ¶¶ 193–203. In Count II, all Plaintiffs bring a claim for civil perjury under 14 M.R.S. § 870. Am. Compl. ¶¶ 204–08. Better Way Ford brings two counts against Ford—Count III for violation of the Automobile Dealers' Day in Court Act ("**ADDCA**"), 15 U.S.C. § 1222, and Count IV for breach of contract. Am. Compl. ¶¶ 209–16. Peggy and Eric bring their own breach of contract claim as third party beneficiaries under Count V, in addition to a tortious interference claim as Count VI. Am. Compl. ¶¶ 217–24. Finally, Cianchette Family, LLC brings Count VII, another tortious interference claim. Am. Compl. ¶¶ 225–28. The Defendant now moves to dismiss the Amended Complaint in its entirety. MTD 1.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), 'a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief,' with 'enough factual detail to make the asserted claim plausible on its face.'" *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 36 F.4th 29, 33 (1st Cir. 2022) (quoting *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. "Plausible" means "more

than merely possible." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). While I take as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in the Plaintiffs' favor, I do not credit "conclusory legal allegations" or "factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Legal Sea Foods*, 36 F.4th at 33–34 (1st Cir. 2022) (citations and internal quotation marks omitted).

The parties have submitted numerous exhibits and transcripts from earlier proceedings in connection with the Amended Complaint and the Motion to Dismiss. It is well-established that I "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996). And I am not required to accept an allegation that is contradicted by a written document that is properly before me. *Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014).

"In addition to evaluating the sufficiency of a complaint, a court may consider affirmative defenses like res judicata in ruling on a motion to dismiss for failure to state a claim." *FEDEQ DV004, LLC v. City of Portland*, 597 F. Supp. 3d 463, 469 (D. Me. 2022). As long as the facts establishing the affirmative defense are clear on the pleadings' face and do not leave doubt that the defense applies, dismissal under Rule 12(b)(6) is appropriate. *Id.* And, in evaluating an affirmative defense, I am allowed to consider "the allegations of the complaint, the documents (if any) incorporated

therein, matters of public record, and other matters of which the court may take judicial notice." *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 16 (1st Cir. 2003).

## DISCUSSION

Ford advances several arguments in support of its motion to dismiss. First, it contends that the Amended Complaint should be dismissed in its entirety under the doctrine of collateral estoppel. MTD 1. Second, it argues that the applicable statutes of limitations bar the Plaintiffs' claims under the Dealers Act and the ADDCA. MTD 1. Third, Ford argues that the civil perjury claim should be dismissed because the Plaintiffs cannot "demonstrate that the alleged testimony was in fact false or that any alleged falsity in the testimony could not have been discovered by due diligence." MTD 15. Fourth, Ford argues that the ADDCA claim fails because the Plaintiffs did not allege that Ford coerced or intimidated them regarding the failed sale of the dealership. MTD 2. Fifth, it contends that the breach of contract claims fail because the Plaintiffs have not identified any sections of the 2013 SSA that Ford allegedly breached. MTD 2. Finally, Ford argues for dismissal of the tortious interference claims because the Plaintiffs fail to allege that Ford acted fraudulently or with intimidation. MTD 2. I address the Defendant's arguments count by count. And because "[t]he gravamen of the instant Amended Complaint is Ford's perjury," Pls.' Opp'n to Ford Motor Company's Mot. to Dismiss Pls.' Am. Compl. ("**Pls.' Opp'n**") 6 (ECF No. 57), I begin there.

# I.     Perjury (Count II)

In Count II of the Amended Complaint, the Plaintiffs assert that Ford violated

Maine's civil perjury statute, 14 M.R.S. § 870. That law provides:

> When a judgment has been obtained against a party by the perjury of a witness introduced at the trial by the adverse party, the injured party may, within 3 years after that judgment or after final disposition of any motion for relief from the judgment, bring an action against such adverse party, or any perjured witness or confederate in the perjury, to recover the damages sustained by the injured party by reason of such perjury.

14 M.R.S. § 870(1). The civil perjury statute requires that the plaintiff "identify the

specific testimony alleged to be false at the initial filing of the claim," 14 M.R.S.

§ 870(2), and "the pleading . . . requirements . . . must be strictly construed." 14 M.R.S.

§ 870(6). Further, a perjury claim "may not be submitted . . . solely on the same record

as in the former trial" and "[e]vidence discoverable by due diligence before the trial

cannot be introduced as new evidence to establish perjury." 14 M.R.S. § 870(3).

The elements of a civil perjury claim are: "(1) a judgment obtained against a

party, (2) by the perjury of the witness, and (3) introduced at the trial by the adverse

party." *Bean v. Cummings*, 2008 ME 18, ¶ 9, 939 A.2d 676. Perjury plaintiffs must

prove by clear and convincing evidence that "(1) the witness lied, and (2) the witness

knew his testimony was false." *Borlawsky v. Town of Windam*, No. CV-99-426, 2004

WL 1433634, at *3 (Me. Super. Ct. Mar. 30, 2004) (citing *Spickler v. Greenberg*, 644

A.2d 469, 471 (Me. 1994)). Perjury claims also require newly discovered evidence.

*Bean*, 2008 ME 18, ¶ 9, 939 A.2d 676. The heightened pleading requirements set forth

in Rule 9(b) apply to civil perjury claims to "ensure that disgruntled litigants are not

able to use civil perjury claims as a means to re-litigate cases when they are displeased with the outcomes." *Id.* ¶ 12.

The Plaintiffs allege that McDonough's testimony in the 2022 Board proceeding revealed that she repeatedly lied during the trial for the 2016 case in four major ways:

> (1) she lied when she testified that she was authorized by Ford to provide an affidavit and testimony on Ford's behalf; (2) she lied when she testified that nothing else was necessary to finalize or "execute" Ford's approval of the 2015 Transaction; (3) she lied when she testified that the dealership stock and goodwill could be pledged as collateral; and (4) she lied when she testified that Ford had unequivocally approved the 2015 Transaction.

Am. Compl. ¶ 14.[9]

Ford contends that McDonough's testimony at the 2022 Proceeding was consistent with her 2016 trial testimony and that "[e]ach and every allegation in Plaintiffs' Amended Complaint accusing Ford and its employee Ms. McDonough of providing false testimony amount to mere semantics and differences in word choice, or at most trivial inconsistencies that do not rise to the level of civil perjury." MTD 16. Ford further argues that "the Amended Complaint fails to demonstrate how the alleged 'perjury' could not have been discoverable by due diligence before the [2016] trial." MTD 16.

---

[9]     The Plaintiffs also specifically allege what they contend were McDonough's lies. Am. Compl. ¶¶ 145–90.

**A.     Testimony on Approval of the 2015 Transaction and Whether Ford Had Any Additional Steps Before the Transaction Was Executed**

I review each of the four ways the Plaintiffs contend McDonough perjured herself beginning with the second and fourth categories of alleged falsehoods: whether Ford approved the 2015 Transaction and whether there was anything left for Ford to do execute the transaction. The Plaintiffs contend that when she testified at trial, McDonough omitted parts of Ford's approval process, Am. Compl. ¶¶ 139–61, falsely stated that Ford had approved the 2015 Transaction, Am. Compl. ¶¶ 167–77, and falsely testified that nothing "else [was] necessary besides the closing in order for Ford to sign [the term agreement with Tucker] and finalize the approval" of the 2015 Transaction. Am. Compl. ¶ 186; *see also* Am. Compl. ¶¶ 187–92.

The theory that McDonough lied when she testified that the transaction was approved and that there was nothing left for Ford to do to execute the agreement is not plausible on a reading of McDonough's entire[10] trial testimony. At trial, McDonough described what happened in 2015 as follows:

- She received an email from Tucker indicating that he had entered an agreement with his partners to amend his membership interest in a way that would make him the sole owner of Casco Bay Ford. MTD Ex. C 723:22–725:22 (ECF No. 50-3).

---

[10]     The Plaintiffs, claiming that they have "plausibly alleged inconsistencies," Pls.' Opp'n to Ford Motor Company's Mot. to Dismiss Pls.' Am. Compl. ("**Pls.' Opp'n**") 20 (ECF No. 57), fault Ford for misstating the motion to dismiss standard and for submitting McDonough's entire trial testimony. But I see nothing wrong with Ford's submission of McDonough's entire trial testimony. *See Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (court may properly consider on a motion to dismiss the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint). Viewing the testimony as a whole is necessary to determine whether the Plaintiffs' claims of perjury are plausible. *See United States v. Serafini*, 167 F.3d 812, 820 (3d Cir. 1999) (quoting *Fotie v. United States*, 137 F.2d 831, 842 (8th Cir. 1943) ("[P]erjury may not be sustained by the device of lifting a statement of the accused out of its immediate context and thus giving it a meaning wholly different than that which its context clearly shows.").

- Tucker's email was considered a request for an amendment.[11] MTD Ex. C 720:9–720:14. Ford's practice for amendments was to ask for a letter from the dealer on dealership letterhead, signed by somebody with managerial authority. Ford then would reach out to the candidate and get corporate minutes, any loan documents, and new lease documents. It also would review all of the performance metrics to make sure that the dealership was performing at or above group on key metrics. MTD Ex. C 727:1–727:11.
- The amendment process was followed in response to Tucker's request. MTD Ex. C 727:12–727:15.
- McDonough requested a letter on dealership letterhead detailing the request for an amendment. MTD Ex. C 720:23–721:2.
- After Tucker provided that letter, McDonough forwarded the letter to her retail network specialist in Dearborn (Wendy Avery), who was responsible for sending Tucker the required documents. MTD Ex. C 721:15–721:19, 730:22–730:24.
- McDonough conducted a sales and profit forecast for Casco Bay Ford based on the past three years and compared it to the group of New England dealers, which demonstrated that Casco Bay Ford performs well. MTD Ex. C 721:23–721:24, 722:7–722:17.
- After that, McDonough looked at Casco Bay Ford's financial statements for the past 12 months, which showed that the store was profitable. MTD Ex. C 722:18–723:1.
- McDonough concluded that Casco Bay Ford could support the ten-year loan that Tucker intended to take out to complete the purchase. MTD Ex. C 723:15–723:20.
- To obtain approval from Ford for an amendment, a dealer also needed FMCC's approval if it was using FMCC as a finance source. *See* MTD Ex. C 725:5–725:8. McDonough sent her profit and sales forecast to Tucker and Vince Talia at FMCC who needed it for his evaluation of Casco Bay Ford and its application for the floor plan financing. MTD Ex. C 724:3–724:19.
- McDonough had discussions with Talia about whether FMCC approved Tucker for a line of credit. MTD Ex. C 726:21–726:25.

---

[11]     McDonough further testified that there were differences between a dealer applying for a buy/sell and an amendment. As opposed to a typical sale of a dealership, an "amendment" to the ownership occurs when an existing dealership wants to give a certain percentage of the membership interest to someone either within the dealership or who wants to buy into the dealership. MTD Ex. C 711:25–712:6 (ECF No. 50-3). There were different requirements for buy/sells and amendments. For example, a buy/sell would involve a goodwill calculation because the dealership would be considered a new corporation, whereas an amendment would not involve a goodwill calculation. MTD Ex. C 712:7–713:7. Additionally, a buy/sell required the dealer to have half of its total dealership investment unencumbered (not capitalized with debt), whereas an amendment did not. MTD Ex. C 713:24–714:4, 738:10–738:24.

- In evaluating a dealership, Ford looks at sales, share of market, customer satisfaction in sales and service, and working capital. Tucker met all of the metrics. MTD Ex. C 727:25–728:7.
- After completing its analysis, Ford approved the amendment, and Avery notified Tucker by email that he had been approved. MTD Ex. C 729:24–731:4.
- The email from Avery indicated that the LOU and Superseding Sales and Service Agreement would be forwarded to Tucker for his signature. MTD Ex. C 731:5–731:12.
- Tucker accepted the LOU by signing it on December 7, 2015. MTD Ex. C 736:2–736:19.
- Nothing else was necessary besides the closing for Ford to sign the LOU and finalize the approval. MTD Ex. C 743:7–743:10.
- From this point, the LOU would be signed by the dealership parties and the regional manager, and after the closing occurs, the document would go to Detroit. The effective date would be added to the first line of the LOU "once Detroit gets it and looks at it." MTD Ex. C 765:1–765:9.
- McDonough acted as "the initial approver" who submitted all the documents for approval by the regional manager "as well as people in Detroit." MTD Ex. C 768:13–768:19.
- After it goes through McDonough, "the regional network specialist would check in all the documents and then it would get reviewed by – there is a franchising coordinator that reviews everything. And then the assistant secretary signs everything. And she reviews before she signs." MTD Ex. C 769:4–769:11.

McDonough's full testimony makes pellucid that Ford had approved the ownership amendment when it sent the LOU, even though there would still be some additional review before the document was executed. With regard to McDonough's use of the word "approved" as opposed to "approvable," the LOU, a standard letter used by Ford, states: "The Company *has approved* a Term Agreement contingent upon your acceptance and execution of this Letter." Mot. to Seal Ex. 3, at 70 (emphasis added); *see* MTD Ex. C 751:25–752:1.[12] It also states: "This Letter will become

---

[12]     I note that the Board found that McDonough testified credibly that "it would have been unreasonable for FMC[C] to withhold its approval in 2015," MTD Ex. F at ¶ 22 (ECF No. 50-6), and further found that

effective when it has been signed/executed by and on behalf of the dealer and Ford Motor Company by its Assistant Secretary." Mot. to Seal Ex. 3, at 74. The Plaintiffs have not plausibly alleged that McDonough made false statements at trial.[13] Nor have they plausibly alleged that McDonough committed perjury by purposely omitting details about the final check because the Plaintiffs' attorneys did not question her further on the finalization process.

### B.   Testimony About Tucker Pledging His Membership Interest as Collateral for the Androscoggin Loan

Next, I consider the Plaintiffs' contention that McDonough committed perjury by testifying that the 2015 Transaction was approved even though Tucker was "pledg[ing] his membership interest – with the right to control the dealership – to his lender." Am. Compl. ¶ 178. The Plaintiffs claim that this was a lie because Ford does not permit dealers to pledge stock to lenders in a way that would give a lender control

---

FMC[C] reviewed and *approved* the proposed transaction which Tucker sought. It considered the financial records of the dealership under Tucker's ownership and operation and decided that Tucker satisfied its requirements; and that the dealership would be able to meet the financial obligations which he had committed to.

MTD Ex. F at ¶ 21 (emphasis added).

[13]     Even if I were to find some falsity in McDonough's testimony, that falsity would not be newly discovered evidence. The LOU was admitted into evidence during the trial, and it stated that Ford "approved" the amendment, but it was not yet effective. MTD Ex. C 731:5–731:16; Mot. to Seal Ex. 3, at 70 (ECF No. 56-4). In addition, McDonough answered "no" to the question "Was anything else necessary besides the closing in order for Ford to sign this document and finalize the approval." Am. Compl. Ex. D 737:7–10. The additional things that Ford had to do were baked into the question: sign the LOU and finalize the approval. Thus, any issue the Plaintiffs have with McDonough saying the amendment was "approved" when there was still something to do before the deal officially went through could have been dealt with at trial. *See Bean v. Cummings*, 2008 ME 18, ¶ 8, 939 A.2d 676, 679 (finding the plaintiff could not "sustain a perjury claim by merely alleging that certain portions of [the defendant's] testimony were false without showing that information demonstrating its falsity was unavailable to him *before the judgment*." (emphasis added)).

over a dealership. Am. Compl. ¶ 180. Nor, the Plaintiffs contend, does Ford allow

dealers to pledge goodwill value as collateral to lenders. Am. Compl. ¶ 180.

First, considered in context, the record does not plausibly support that this

testimony was false. The Plaintiffs once again omit key parts of McDonough's

explanation of the different pledging requirements. McDonough testified that:

- Ford has different requirements and a different process for new buyers than it has for membership amendments. MTD Ex. C 712:13–712:20.
- With an asset purchase agreement, it's a whole new corporation, and Ford requires a goodwill amount and a working capital amount. Half of that amount can be capitalized by debt and half has to be unencumbered by debt. MTD Ex. C 712:21–713:22.
- With an amendment, the corporation doesn't change, so there is not a goodwill calculation and there is no requirement that a dealer have a certain percentage of unencumbered funds because "it's an existing corporation and the working capital is already there and I can look at it and see that it is in the business." MTD Ex. C 719:1–720:4.
- McDonough was aware that Tucker was getting a ten year loan to effectuate the buyout of Peggy and Eric, and she analyzed Casco Bay Ford and satisfied herself that "the store could support that kind of loan." MTD Ex. C 723:15–724:2.
- McDonough explained to Peggy that Ford made sure that the dealership's operation and profitability could support the capital loan that Tucker secured to purchase the PET shares from her and Eric. She further explained that Ford allows promissory notes [here a 10-year note with a 5% interest rate] where Ford concludes that the dealership has enough working capital to pay off the loan. MTD Ex. C 748:3–750:19.
- McDonough had a copy of the commitment letter from the bank and understood that Tucker was using his membership interest in PET as collateral for the loan. MTD Ex. C 765:24–766:6, 766:17–767:6.
- Where there is a change in membership as opposed to an asset purchase agreement, as far as unencumbered funds and goodwill go, Ford verifies whether there is a source of funds that comes from an individual's unencumbered funds in a bank account or a promissory note. If it's a promissory note, Ford looks to whether the dealership can make the payments. If it can, then Ford is likely to approve the transaction if the other aspects of the transaction are approvable. MTD Ex. C 772:9–773:7.

Even judged solely by the limited excerpts the Plaintiffs provided of the Board hearing, McDonough's testimony remained consistent in that forum. She testified:

- She understood that Tucker was pledging his membership interest in PET as collateral for the loan. Unsealed Am. Compl. Ex. E 1488:7–1488:11 (ECF No. 40-1).
- Because a franchise is awarded, it is not for sale and it cannot be used as collateral. Unsealed Am. Compl. Ex. E 1488:4–1488:6.
- Tucker could pledge his membership interest in PET, but he could not pledge the actual franchise as collateral. She had the loan agreement, and the actual franchise was not listed as collateral. Unsealed Am. Compl. Ex. E, 1488:12–1488:24, 1503:23–1504:21.

In response to a question on whether Tucker would have been approved if he had pledged control over the franchise, McDonough responded: "You cannot pledge it; It's not something you can pledge." Unsealed Am. Compl. Ex. E 1504:17–1504:18. With respect to pledging goodwill as collateral, McDonough explained that, because the deal was a membership interest purchase not an asset purchase, "there was no requirement that PET's goodwill remain unencumbered." Am. Compl. Ex. C ¶ 10.

The Plaintiffs allege that "[o]ne of the major lines of questioning in the 2016 Lawsuit was whether Ford would permit Tucker to pledge his membership interest— *with the right to control the dealership*—to his lender." Am. Compl. ¶ 178 (emphasis added). That allegation is not supported by the record. McDonough testified consistently at trial regarding the requirements about encumbrances. *See, e.g.*, MTD Ex. C 738:10–738:24. McDonough's trial testimony contains no statement that Tucker pledged *control* of the dealership to get the loan, just his membership interest. *See* Am. Compl. Ex. D 765:1–774:15. The Plaintiffs conflate pledging the membership interest with pledging control of the franchise to allege that McDonough testified

23

falsely that the transaction was approved even though Tucker had pledged control over the membership interest. They leave out McDonough's explanation that *Tucker had not pledged control of the dealership*, so pledging his membership interest was not an impediment to Ford approving the deal. Am. Compl. ¶ 184 & Ex. E 1503:23–1504:21.

Even if Plaintiffs could succeed on their allegations that the testimony was false, which they cannot, the testimony could not be the basis of a perjury claim for another reason—it was not based on newly discovered evidence. *See Bean*, 2008 ME 18, ¶ 9, 939 A.2d 676, 679. The Plaintiffs were aware of Ford's capital requirements before the trial because of representations Ford made in letters and agreements related to the 2013 Transaction. *See* Am. Compl. ¶¶ 38–43. The Plaintiffs admit as much in their opposition to Ford's motion to dismiss by claiming, "[w]hen McDonough testified [at trial] Plaintiffs knew that what she was saying was inconsistent with their understanding of Ford's stated policies." Pl.'s Opp'n 16. Plaintiffs have had every opportunity to point out the perceived falsity in McDonough's testimony.

### C.   Testimony About McDonough's Authority to Give an Affidavit and Testify on Behalf of Ford

Finally, I consider the Plaintiffs' contention that McDonough committed perjury when she stated at trial and in her affidavit that Ford authorized her to give the affidavit and testify in the 2016 Lawsuit. The Plaintiffs point out that during the Board proceedings in 2022, McDonough admitted that she never told anyone at Ford that she was testifying or providing the affidavit for the 2016 Lawsuit. Specifically, she said that she thought the statement that she was authorized to give the affidavit

was truthful at the time, but she understood differently by the time of the Board proceedings. Unsealed Am. Compl. Ex. E 1551:10–1552:8. McDonough said, "[i]n retrospect, I probably should have reached out to counsel before providing that affidavit." Unsealed Am. Compl. Ex. E, at 1498:12–1498:19.

Again, the Plaintiffs' theory depends on a selective reading of the trial transcripts. Tucker's counsel asked, "And in what capacity are you testifying today? Are you here as Ford's representative?" MTD Ex. C 706:20–706:21. When McDonough answered affirmatively, the Plaintiffs' counsel asked for a sidebar. MTD Ex. C 706:22–707:2. At sidebar, the attorneys discussed with the court whether McDonough could testify that Ford authorized her to be there and whether she could say that she was speaking for Ford. MTD Ex. C 707:2–708:14. After some discussion about whether "there is such a thing as a 30(b)(6) for trial,"[14] the Court stated, "I guess the answer is she is authorized by Ford to be here. I assume that that's fair," and Plaintiffs' counsel responded, "That's fair." MTD Ex. C 707:10, 707:15–707:18. And when the Court said that "she can certainly say she's authorized by Ford," Plaintiffs' counsel did not "have a problem with that." MTD Ex. C 708:4–708:6. When questioning resumed, McDonough was asked "have you been authorized by Ford to testify today?" she responded, "Yes." MTD Ex. C 714:17–714:19.

First, I question whether a lay witnesses who at the time of her testimony had worked for Ford for 28 years and who was the manager responsible for the transaction

---

[14]   McDonough did serve as Ford's Rule 30(b)(6) witness during the Board proceedings. *See* Am. Compl. Ex. G, at 2.

she was called to testify about, could commit perjury by affirming that she was authorized by Ford to speak on its behalf. Second, at the Board, McDonough testified that at the time she gave this trial testimony, she thought she was authorized. This undercuts the Plaintiffs' perjury claim because civil perjury requires that the witness knew her testimony was false at the time it was given. *See Borlawsky*, 2004 WL 1433634, at *3. But the biggest problem for the Plaintiffs is that they were aware at the time of the trial that she could not speak for Ford. They brought that issue to the Court's attention, and Plaintiffs' counsel at trial stated that he did not have a problem with her saying that she was authorized by Ford. "Evidence discoverable by due diligence before the trial cannot be introduced as new evidence to establish perjury." 14 M.R.S. § 870(3). The proper avenue for relief if they disagreed with the court's decision to allow the testimony (which they clearly did not at the time) would have been to make it an issue in their appeal.

Because I find that none of the four categories of alleged perjury are actionable under Maine's civil perjury statute, Count II is dismissed. I turn next to Count I.

## II.    Violation of the Dealers' Act (Count I)

Count I of the Amended Complaint asserts a claim for violation of Maine's Dealers Act, 10 M.R.S. § 1174. Ford contends that the Plaintiffs are precluded from bringing Count I because that claim "was fully adjudicated before the [Board] after a five (5) day hearing." MTD 12.

In Maine,[15] "[t]he doctrine of res judicata—literally, 'thing adjudged'—is a court-made collection of rules designed to ensure that the same matter will not be litigated more than once." *Beegan v. Schmidt*, 451 A.2d 642, 643–44 (Me. 1982). "Res judicata consists of two components—issue preclusion and claim preclusion." *Pacheco v. Libby O'Brien Kingsley & Champion, LLC*, 2022 ME 63, ¶ 7, 288 A.3d 398. Issue preclusion, or collateral estoppel, prevents parties from relitigating factual issues that were already decided in an earlier proceeding. *Id.* Claim preclusion bars relitigating a party's claim. *See 20 Thames St. LLC v. Ocean State Job Lot of Me. 2017 LLC*, 2021 ME 33, ¶ 15, 252 A.3d 516.

Before diving into specifics, I address a threshold issue. The Plaintiffs argue that Ford's res judicata argument is procedurally improper at this stage. Pl.'s Opp'n 4. Although claim preclusion is an affirmative defense typically asserted in an answer, it may be adjudicated on a motion to dismiss if the facts establishing the defense appear on the face of the complaint, the documents incorporated therein, matters of public record, and other matters susceptible to judicial notice. *See Medina-Padilla v. U.S. Aviation Underwriters, Inc.*, 815 F.3d 83, 85 (1st Cir. 2016); *In re Colonial Mortg. Bankers Corp.*, 324 F.3d at 15–16; *Sutliffe v. Epping Sch. Dist.*, 627

---

[15]     State law determines the preclusive effect of a prior state court decision in federal court under the doctrines of claim and issue preclusion. *See* 28 U.S.C. § 1738; *FEDEQ DV004, LLC v. City of Portland*, 597 F. Supp. 3d 463, 473 (D. Me. 2022); *Bastille v. Me. Pub. Emp. Ret. Sys.*, No. 1:16-cv-31-NT, 2016 WL 4250256, at *4 (D. Me. Aug. 10, 2016); *In re Sonus Networks, Inc., S'holder Derivative Litig.*, 499 F.3d 47, 56 (1st Cir. 2007); *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). Accordingly, I apply Maine law to consider the preclusive effect of the Board's decision.

F. Supp. 2d 41, 44 (D.N.H. 2008).[16] At oral argument, Plaintiffs' counsel asserted that, while a court may consider documents incorporated within or attached to the complaint in order to assess preclusion, it may not consider the entire record of the earlier proceeding. *See* Oral Arg. Tr. 20:24–22:18 (ECF No. 76). The First Circuit has been clear, however, that "where [a] motion to dismiss is premised on a defense of res judicata . . . the court may take into account the record in the original action." *Andrew Robinson Int'l, v. Hartford Fire Ins. Co.,* 547 F.3d 48, 51 (1st Cir. 2008). Accordingly, I am not limited to the face of the Amended Complaint. I may also consider whether the state court records contain facts that establish the claim preclusion defense. Having addressed the Plaintiffs' procedural argument, I turn to the substance of the Defendant's claim preclusion argument.

The Defendant argues that all of the Plaintiffs' claims are precluded under either issue or claim preclusion, but the Defendant's issue preclusion argument is fraught,[17]  and I focus only on whether Plaintiffs are barred from bringing Count I under claim preclusion principles.

---

[16]     While I look to Maine's law to analyze the res judicata arguments, federal law governs the 12(b)(6) standard. *See SBT Holdings, LLC v. Town of Westminster,* 547 F.3d 28, 36 (1st Cir. 2008); *Medina-Padilla v. U.S. Aviation Underwriters, Inc.,* 815 F.3d 83, 85 (1st Cir. 2016).

[17]     Ford posits that collateral estoppel bars all of the Plaintiffs' claims, because each "are dependent upon Plaintiffs establishing that Ford—instead of Plaintiffs—was responsible for the failed sale of the Casco Bay Ford dealership to Tucker" and the jury found that Peggy, Eric, and the Cianchette Family, LLC were liable for the failed sale of Casco Bay Ford in the 2016 Lawsuit. MTD 10–11. Because Ford's argument on this front is not fully developed as to each claim in the present action, and because I find that there are alternative bases for dismissal of each claim, I do not resolve this argument.

Claim preclusion prevents relitigating claims if "(1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been, litigated in the first action." *20 Thames St. LLC*, 2021 ME 33, ¶ 15, 252 A.3d 516 (quoting *Wilmington Tr. Co. v. Sullivan-Thorne*, 2013 ME 94 ¶ 7, 81 A.3d 371).

The first element is met. Better Way Ford, Peggy, and Eric are bringing the Section 1174 claim against Ford, and they were the same parties who brought the same claim against Ford before the Board.[18] MTD Ex. E 17.

As for the second element, the Board has authority to "hold a hearing *on the merits* of a complaint." 10 M.R.S. § 1189 (emphasis added). It exercised that power to hold a hearing from September 19 to September 23, 2022. MTD Ex. F, at 1. Multiple witnesses testified for both sides, including Ann McDonough. MTD Ex. F, at 2. The five-member Board unanimously found that Ford had not violated Section 1174 and it issued an Order to that effect. MTD Ex. F, at 1. The Board matter is now pending on appeal before the Maine State Superior Court, with the docket number BCD-APP-2023-00005. Although the parties do not address the issue, it appears that in Maine "[t]he general rule is that a judgment is final for purposes of *res judicata* despite the pendency of an appeal." *Bartlett v. Pullen,* 586 A.2d 1263, 1265 (Me. 1991).

---

[18]    In the Board proceeding, Better Way Ford, Peggy, and Eric also named FMCC as a defendant. MTD Ex. E 17 (ECF No. 50-5). FMCC was originally named as a defendant to the Dealers Act claim in this suit, but the Amended Complaint removed it as a defendant. Am. Compl. ¶ 3 n.1.

The Plaintiffs argue that this second claim preclusion element cannot be met by an order from the Board because the Dealers Act provides that "[a] final judgment, order or decree rendered against a person in any civil, criminal or administrative proceeding . . . is regarded as prima facie evidence against the person." Pls.' Opp'n 13 (quoting 10 M.R.S § 1173).  Under the Plaintiffs' reading, a party could lose on its Section 1174 action before one tribunal, and then bring that same exact claim in another forum and the Board's order would only be prima facie evidence against the loser.

The Defendant did not really address this point, but when asked at oral argument, defense counsel posited that Section 1173's "prima facie evidence" language might involve the fact that the Board cannot issue damage awards. That does seem to be the import of Section 1173. In *Ford Motor Company v. Darling's*, the Law Court shed light on the Dealers Act and the purpose of 10 M.R.S. § 1173:

> Section 1188, which establishes the Board's duties, does not authorize the Board to award damages to plaintiffs who prevail under the Dealers Act. Section 1188 empowers the Board to review complaints, issue written decisions and orders, levy civil penalties, and award attorney fees and costs, but it does not on its face authorize the Board to award damages. 10 M.R.S. § 1188(1)-(4).
>
> ***
>
> Instead, the right to damages pursuant to the Dealers Act is governed by section 1173(1).
>
> ***
>
> Further, section 1189-B(2), which governs appeals from the Board to the Superior Court, provides that an appeal for a hearing on the merits of the dispute before the Superior Court "is subject to the provisions of section 1173." Thus, once a proceeding before the Board is completed and an appeal is taken on the merits pursuant to section 1189-B(2), a franchisee may then bring its action for damages pursuant to section

1173 as part of the hearing before the Superior Court. An action for damages brought pursuant to section 1173 is therefore separate from an administrative complaint filed with the Board pursuant to section 1188(1).

\*\*\*

The Dealers Act thus sets forth a process by which plaintiffs claiming damages may seek them either (1) in an original action, or (2) in an appeal for a hearing on the merits filed with the Superior Court. As made clear by the plain language and structure of the statute, it is the court, and not the Board, that may ultimately award damages.

*Ford Motor Co. v. Darling's*, 2014 ME 7, ¶¶ 43–46, 86 A.3d 35. This explanation, which is consistent with the heading of 1173(1)—"Civil remedies"—demonstrates that section 1173 provides a mechanism for parties before the Board to seek an award of damages elsewhere. It does not mean that Board rulings lose their status as valid final judgments.[19]

The Plaintiffs also argue that the Board's determination should not be given preclusive effect because there are "substantial differences in the availability or admissibility of evidence" between the proceeding before the Board and a court. Pls.' Opp'n 14 (internal quotations and citations omitted). Federal courts look to state law to determine the preclusive effect of state agency determinations. *See Diaz v. City of Somerville*, 59 F.4th 24, 29 (1st Cir. 2023) ("When a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had

---

[19]    In an undeveloped (and thus waived) argument, the Plaintiffs seem to argue that if they cannot bring a second action in federal court on their Dealers Act claim, they will have been deprived of their right to a jury under the Maine Constitution. Pls.' Opp'n 14. The Dealers Act, however, provides that plaintiffs can appeal the Board's factual findings to the Superior Court, where they can get a jury to consider whether the factual findings of the Board were supported by clear and convincing evidence. 10 M.R.S. § 1189-B. It is unclear on the record before me whether the Plaintiffs ever exercised that right.

an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." (quoting *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986)); *FEDEQ*, 597 F. Supp. 3d at 473–74. In Maine, "[r]es judicata principles apply equally to administrative proceedings, so long as they 'entail the essential elements of adjudication.' " *Bastille v. Me. Pub. Emp. Ret. Sys.*, No. 1:16-cv-31-NT, 2016 WL 4250256, at *4 n.3 (D. Me. Aug. 10, 2016) (quoting *Town of Freeport v. Greenlaw*, 602 A.2d 1156, 1160 (Me. 1992)); *see Hebron Acad., Inc. v. Town of Hebron*, 2013 ME 15, ¶ 28, 50 A.3d 774; *FEDEQ*, 597 F. Supp. 3d at 473–74.

> Those elements include 1) adequate notice, 2) the right to present evidence and legal argument and to rebut opposing evidence and argument, 3) a formulation of issues of law or fact to apply rules to specified parties concerning a specified transaction, 4) the rendition of a final decision, and 5) any other procedural elements as may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question.

*Bastille*, 2016 WL 4250256, at *4 n.3 (internal quotations omitted). The Board's rules largely adhere to the Maine Rules of Civil Procedure, and they provide for notice, pleadings, discovery, motions, and recorded evidentiary hearings where witnesses can be compelled to testify under oath. *See generally* 10 M.R.S. § 1188(6); 29–250 C.M.R. ch. 14, §§ 1(1), 3–7.

The Plaintiffs note that "the Maine Rules of Evidence did not apply in the 2022 Hearing as the Board instead applies its own evidentiary rules." Pls.' Opp'n 14. However, the Law Court has found that the essential elements of adjudication are present provided that both sides may present evidence even if "not in strict conformity

with the Rules of Evidence." *Beal v. Allstate Ins. Co.*, 2010 ME 20, ¶ 15, 989 A.2d 733.[20] The Board decision, then, is a valid final judgment.

As for the third element of claim preclusion, the question is whether the same matters presented in the current action were, or might have been, litigated in the action before the Board. This question is resolved with a "transactional test," wherein the court looks at "the aggregate of connected operative facts that can be handled together conveniently for purposes of trial to determine if they were founded upon the same transaction, arose out of the same nucleus of operative facts, and sought redress for essentially the same basic wrong." *20 Thames St. LLC*, 2021 ME 33, ¶ 17, 252 A.3d 516 (quoting *Sebra v. Wentworth*, 2010 ME 21, ¶ 12, 990 A.2d 538).

The facts and charges against Ford in the Board complaint mirror those in this case. For example, the Plaintiffs alleged in both that "Ford engaged in an arbitrary, bad faith, and unconscionable course of conduct related to Tucker's attempt to purchase Peggy and Eric's membership interest in Casco Bay Ford and the ensuing litigation." Am. Compl. ¶ 199; MTD Ex. E ¶ 124. And both alleged that "Ford discriminated and used unreasonable, arbitrary, and unfair performance standards related to Tucker's attempt to purchase Peggy and Eric's membership interest in Casco Bay Ford and the ensuing litigation." Am. Compl. ¶ 202; MTD Ex. E ¶ 126.

---

[20] The Plaintiffs had a right to appeal the Board decision and get a jury trial in the Superior Court to consider whether the Board's factual findings were supported by clear and convincing evidence. *See Ford Motor Co. v. Darling's*, 2014 ME 7, ¶ 35, 86 A.3d 35 . Presumably the Maine Rules of Evidence would have applied at any such hearing in the Superior Court.

The Amended Complaint does contain an additional allegation regarding Ford's perjury and bad acts during discovery leading up to the Board hearing and during the hearing itself, because McDonough's testimony in her deposition and the Board hearing was largely consistent with her trial testimony. As discussed above, however, the Plaintiffs have failed to plead a plausible perjury claim. Even if they had, the allegations that McDonough lied are not new. Their Board complaint was already based on McDonough's allegedly false testimony in 2018. MTD Ex. E ¶ 109. And even if the Plaintiffs now claim that McDonough's testimony during the Board proceedings was false or inconsistent, they had every opportunity to point out those inconsistencies during the hearing. They cannot now bring another action when they failed to convince the Board that McDonough's testimony was indeed false. If that were the standard, then there would be no limit on the number of times this case could be tried. The Plaintiffs could just reassert after losing again and again that McDonough perjured herself in the prior proceeding. Notably, there are no allegations that Ford engaged in any conduct after the Board hearing that would permit the Plaintiffs to bring a new case. *See 20 Thames St. LLC*, 2021 ME 33, ¶¶ 22–23, 252 A.3d 516; *In re Kaleb D.*, 2001 ME 55, ¶ 11, 769 A.2d 179 (explaining how actions after the first case can "constitute new, independent events that are actionable in and of themselves").

Because claim preclusion applies to the Board's decision on whether the Ford violated the Dealers Act, Count I is dismissed.[21]

## III.   Violation of the Automobile Dealers' Day in Court Act (Count III)

In Count III of the Amended Complaint the Plaintiffs allege a violation of Section 1222 of the ADDCA. Specifically, the Plaintiffs contend that Ford "failed to act in good faith in performing and complying with the terms and provisions of the 2013 Sales & Service Agreement[22] between Ford and Better Way Ford." Am Compl. ¶ 211. The Defendant argues that the Plaintiffs' ADDCA claim fails because they do not allege that Ford coerced or intimidated them or made a wrongful demand that would have resulted in penalties or sanctions. MTD 17.

Under the ADDCA, an automobile dealer can sue a manufacturer who fails to "act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222. The statute defines "good faith" as

> the duty of each party to any franchise . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).

---

[21]    The Plaintiffs also assert that res judicata cannot bar their claims because the verdict at trial turned on false testimony. Pls.' Opp'n 4–5, 13.  Because I have already found that the Plaintiffs have not plausibly alleged that the verdict was a product of fraud, that argument is a non-starter.

[22]    "Franchise" is defined in the Automobile Dealers' Day in Court Act ("**ADDCA**") as "the written agreement or contract between" the manufacturer and dealer "which purports to fix the legal rights and liabilities of the parties to such agreement or contract." 15 U.S.C. § 1221(b).

"The First Circuit has interpreted the statute's 'good faith' requirement 'very narrowly,' requiring 'actual or threatened coercion or intimidation' to find a lack of good faith." *Aston Martin Lagonda of N. Am, Inc. v. Lotus Motorsports, Inc.*, No. 13–cv–11213, 2014 WL 1092864, at *2 (D. Mass. Mar. 18, 2014) (quoting *George Lussier Enters., Inc. v. Subaru of New Eng.*, 393 F.3d 36, 43 (1st Cir. 2004)). Coercion "must be actual; the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient." *Wallace Motor Sales v. Am. Motors Sales Corp.*, 780 F.2d 1049, 1056 (1st Cir. 1985). Even "malicious conduct or unfairness" does not suffice for an ADDCA claim. *George Lussier*, 393 F.3d at 43.

To state a cause of action under the ADDCA, an aggrieved dealer must allege "that the manufacturer or distributor (1) made a wrongful demand, coupled with (2) sanctions, or threat thereof." *Id.* Thus, the wrongful demand must come with "evidence of a penalty or sanction if the dealer does not comply." *Aston Martin Lagonda*, 2014 WL1092864, at *2. One example of a wrongful demand is insisting that the dealer relinquish a contractual right, as opposed to insisting that the dealer comply with the franchise's reasonable terms. *Saccucci Auto Grp, Inc. v. Am. Honda Motor Co., Inc.*, 617 F.3d 14, 21 (1st Cir. 2010).

The Plaintiffs' ADDCA claim fails to meet this narrow standard. The Plaintiffs argue that Ford's conduct during the 2015 Transaction violated the ADDCA because

> Ford, a global corporate behemoth, improperly used its economic power over Peggy and Eric, local Maine businesspeople, in an effort to favor Tucker Cianchette and compel the Cianchettes to submit to Ford's wish that the sale of the Casco Bay Ford dealership take place on Ford's preferred terms, terms that would have left Eric unfairly exposed to

36

ruinous liability, and then lied in court proceedings about what it had
done.

Pls.' Opp'n 25–26. In addition, they argue that Ford refused to allow Peggy to speak
with additional representatives "to assist her in ensuring the terms of the 2015
Transaction we[re] executed as negotiated among the parties." Pls.' Opp'n 26.

The Plaintiffs cite out of circuit cases instead of grappling with the First
Circuit's narrow standard. Pls.' Opp'n 26. The Plaintiffs did not allege that Ford made
any demands of them during the 2015 Transaction. Ford did not seek the membership
change. Tucker (with Peggy and Eric's purported agreement) approached Ford about
the amendment. The Plaintiffs allege that Ford compelled Eric and Peggy to submit
to "Ford's wish that the sale of the Casco Bay Ford dealership take place on Ford's
preferred terms, terms that would have left Eric unfairly exposed to ruinous liability."
Pls.' Opp'n 25–26. Ford's *wishes* and *preferred* terms are not demands. Nor is there
any allegation that Ford threatened sanctions or penalties if the 2015 Transaction
did not close. And it is clear from the Amended Complaint that Peggy and Eric did
not submit to Ford's alleged coercion that the 2015 Transaction go through on Ford's
preferred terms. *See Wallace*, 780 F.2d at 1056 (stating that plaintiffs must show
"that as the result of intimidation or threats, it was forced to act or refrain from
acting"); *Coady Corp. v. Toyota Motor Dists., Inc.*, 346 F.Supp.2d 225, 234 (D. Mass.
2003). In fact, the Amended Complaint contains no allegations that Peggy and Eric
ever attempted to negotiate with Ford about Ford's preferred terms, and it clearly

alleges that it was Peggy and Eric's decision not to proceed with the transfer.[23] Am. Compl. ¶¶ 112, 116.

The Plaintiffs also argue that there was coercion because there was a power imbalance that Ford used to compel them to submit to its wishes. Pls.' Opp'n 25–26. Setting aside that Eric and Peggy did not actually submit to Ford's wishes, the simple fact that there is a power imbalance is not enough for there to be "coercion"—indeed, courts in this circuit have repeatedly denied recovery to local dealers going up against "global behemoth" manufacturers. *See, e.g.*, *Wagner & Wagner Auto Sales, Inc. v. Land Rover N. Am., Inc.*, 547 F.3d 38, 40 (1st Cir. 2008); *Aston Martin Lagonda of N. Am, Inc.*, 2014 WL 1092864, at *2–3.

Allegations about Ford's supposed lies during the 2018 or 2022 proceedings fare no better. The Plaintiffs assert that "Ford should not be heard to claim that committing perjury does not constitute a failure to act in good faith." Pls.' Opp'n 26 (internal quotations omitted). While the Plaintiffs' idea of "good faith" might align with a more general understanding of the phrase, its meaning within the ADDCA is significantly narrower. *See* 15 U.S.C. § 1221(e); *H.D. Corp. of P.R. v. Ford Motor Co.*, 791 F.2d 987, 990 (1st Cir. 1986). Even if the allegations about McDonough's

---

[23]     The Defendant also contends that the Plaintiffs' claims under the ADDCA and the Dealers Act are barred by the statutes of limitations applicable to those laws. MTD 12. The ADDCA provides for a three-year statute of limitations. 15 U.S.C. § 1223. The Dealers Act establishes a four-year statute of limitations after a cause of action accrues under it. 10 M.R.S. § 1183. The Plaintiffs filed their Complaint in state court on February 10, 2021. Compl. 26 (ECF No. 5-2). The Defendant's argument appears to have merit, at least with respect to Ford's actions in 2015 and 2016. I need not decide this issue, however, because I find that the ADDCA claim fails on the merits and that claim preclusion bars the Dealer's Act claim.

testimony did effectively state a claim for perjury, and I have concluded above that they do not, the Plaintiffs do not explain how McDonough's testimony at trial in 2018 could amount to a wrongful demand with threat of sanctions to make Tucker the sole owner in 2015-16. The Plaintiffs have failed to state a claim as to Count III.

## IV.   Breach of Contract (Counts IV & V)

Count IV is a breach of contract claim that Better Way Ford brings against Ford for breaching its obligation to act in good faith under the 2013 SSA by leading Tucker to believe it would not enforce the standards in the 2013 SSA in connection with the 2015 Transaction. Am. Compl. ¶ 215. Peggy and Eric bring the same claim in Count V as third-party beneficiaries of the 2013 SSA. Am. Compl. ¶¶ 217, 219. Ford moves to dismiss both counts on the grounds that Maine does not recognize an implied duty to perform contracts in good faith outside the insurance context, and the Plaintiffs do not otherwise allege that Ford breached any specific contractual obligation. MTD 18.

But as the Plaintiffs point out, Michigan law governs the 2013 SSA. *See* 2013 SSA § 32 ("The parties intend this agreement . . . to be construed in accordance with the laws of the State of Michigan."). A federal court sitting in diversity must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941). "In Maine, '[w]hen a contract contains a choice of law provision, [Maine law] will generally interpret the contract under the chosen state's laws.' " *James D. Julia, Inc. v. Dan Morphy Auctions, LLC*, No. 1:21-cv-00025-JAW, 2021 WL 2535941, at *7 (D. Me. June 21, 2021) (quoting *Stenzel v. Dell, Inc.*, 2005 ME 37, ¶ 7, 870 A.2d 133).

39

Looking to Michigan law, then, "[i]t is well-established that 'Michigan does not recognize a [separate] cause of action for breach of the implied covenant of good faith and fair dealing.' " *Moore v. Auto Club Servs.*, 615 F. Supp. 3d 670, 686 (E.D. Mich. 2022) (quoting *In re Leix Estate*, 797 N.W.2d 673, 683 (Mich. Ct. App. 2010)). "An implied covenant of good faith and fair dealing in the performance of contracts is recognized by Michigan law only where one party to the contract makes its performance a matter of its own discretion." *Id.* (quoting *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003)). "Discretion arises when the parties have agreed to defer decision on a particular term of the contract." *Stephenson*, 328 F.3d at 826. Another way it may arise is "from a lack of clarity or from an omission in the express contract" such that "the dependent party must rely on the good faith of the party in control." *Id.* (quoting *Hubbard Chevrolet Co. v. Gen. Motors Corp.,* 873 F.2d 873, 877 n.2 (5th Cir. 1989) (applying Michigan law)). The duty only applies if the party's discretion is "unbridled," not if the contract "provides conditions for the use of discretion." *Spitzer Autoworld Akron, LLC v. FCA US LLC*, No. 1:22-cv-01755-PAB, 2023 WL 6809935, at *9 (N.D. Ohio Oct. 13, 2023) (quoting *Harp v. Equilon Enters., LLC*, 2012 WL 975050, at *6 (Mich. Ct. App. Mar. 22, 2012)). "The obligation of good faith cannot be employed, in interpreting a contract, to override express contract terms." *S2 Yachts, Inc. v. ERH Marine Corp.*, No. 1:88-cv-389, 2021 WL 5316908, at *9 (W.D. Mich. Nov. 16, 2021) (quoting *Parlovecchio Bldg., Inc. v. Charter Cnty. of Wayne Bldg. Auth.*, No. 313257, 2014 WL 631264, at *4 (Mich. Ct. App. Feb. 13, 2014)).

The Plaintiffs believe they meet this standard because "Ford made its performance under" the 2013 SSA "a matter of its own discretion, and exercised that discretion in bad faith," by trying to "deceive Peggy and Eric into going through with" the 2015 Transaction "on terms that would have left Eric exposed to ruinous liability, and then lied about what it had done under oath to Peggy and Eric's detriment." Pls.' Opp'n 27. They cite to Section 24(a) of the 2013 SSA. That Section is titled "Company Right to Approve Changes in Ownership," and it provides:

(1) In view of the nature, purposes and objectives of the Company's Dealer Sales and Service Agreements, and the differences in operating requirements among dealerships of differing sizes and types of markets, the Company expressly reserves the right to select the dealers with whom it will enter into such agreements so as to maintain as high quality a dealer organization as possible.

(2) . . . [T]he Dealer acknowledges that the Company has the right to approve or decline to approve any prospective purchaser as to his character, automotive experience, management, capital and other qualifications for appointment as an authorized dealer in COMPANY PRODUCTS for the DEALERSHIP OPERATIONS involved. Approval by the Company of the prospective purchaser shall not, however, be unreasonably withheld. . . .

2013 SSA § 24(a).

Courts applying Michigan law have time and again held that the implied covenant cannot be used to override the express terms of a contract, including when a contract unambiguously grants one party sole approval authority over specified changes to the relationship. *See Stephenson*, 328 F.3d at 826–28; *Hubbard*, 873 F.2d at 877; *Conklin Fangman Kansas City, LLC v. Gen. Motors, LLC*, No. 4:21-cv-0001-DGK, 2021 WL 5889981, at *7 (Dec. 13, 2021); *Lancia Jeep Hellas S.A. v. Chrysler Grp. Int'l LLC*, No. 329481, 2016 WL 1178303, at *9–10 (Mich. Ct. App. Mar. 24, 2016); *S2 Yachts*, 2021 WL 5316908, at *9–10; *Parlovecchio Bldg., Inc. v. Charter*

*Cnty. of Wayne Bldg. Auth.*, No. 313257, 2014 WL 631264, at *4 (Mich. Ct. App. Feb. 13, 2014); *Brooks Auto. Grp. v. Gen. Motors LLC*, 2:18-cv-00798-MJH, 2019 WL 452494, at *5–6 (W.D. Pa. Feb. 5, 2019); *Matthew Enter., Inc. v. FCA US, LLC*, No. 16-cv-03551-LHK, 2016 WL 6778534, at *7–8 (N.D. Cal. Nov. 16, 2016); *Van Wie Chevrolet, Inc. v. Gen. Motors, LLC*, 38 N.Y.S.3d 662, 670 (N.Y. Sup. Ct. 2016); *Anaheim Indus., Inc. v. Gen. Motors Corp.*, No. 01-06-00440-CV, 2007 WL 4554213, at *7 (Tex. App. Dec. 20, 2007). For example, in *Hubbard*, the Fifth Circuit considered whether there was a breach of Michigan's implied covenant of good faith and fair dealing in the context of a relocation dispute between a dealership and GM. 873 F.2d at 877. Under the parties' agreement: "[n]o change in Dealership Location . . . will be made without the written approval of General Motors." *Id.* at 877. The Fifth Circuit held that the covenant did not apply, because

> Unlike the discretionary language at issue in [other cases], this contract language leaves no room for a court or jury to supply limits. These clauses . . . flatly preclude relocation absent GM's approval . . . . The contract does not limit the reasons upon which GM can base its relocation decisions. [The dealer] and GM have deferred no decisions regarding relocation or the relevant factors. They gave GM the authority to approve or disapprove relocation for its own reasons, and thus set out the limits of what the contract requires of these parties.
>
> [The dealer] agreed to operate at the specified location and to request relocation in writing. It can point to no portion of this contract creating "reasonable expectations" that GM would grant such requests.

*Id.* at 878.

As in the *Hubbard* line of cases, the 2013 SSA "did not omit terms, provide ambiguous terms, or defer decision on a particular term." *Lancia*, 2016 WL 1178303, at *10. Put differently, the 2013 SSA did not have the sort of gaps that the implied

42

duty of good faith and fair dealing gets called in to fill. Instead, the contract expressly provided Ford the right to approve changes in ownership.[24] Thus, the implied duty of good faith and fair dealing has no role to play here. Counts IV and V are dismissed.

## V.   Tortious Interference with Contract (Counts VI & VII)

Counts VI and VII are claims for tortious interference. In Count VI, Eric and Peggy allege that Ford interfered with the Membership Purchase Agreement by misrepresenting Ford's franchise standards and claiming that Tucker met the capital requirements during the 2015 Transaction. Am. Compl. ¶¶ 221–24. In Count VII, the Cianchette Family, LLC alleges that Ford interfered with the Real Estate Contract for the same reasons. Am. Compl. ¶¶ 225–28.

In Maine, "[a] viable claim for tortious interference with either an existing contractual relation or a prospective economic advantage requires (1) the existence of a valid contract or prospective economic advantage, (2) interference with that contract or advantage though fraud or intimidation, and (3) damages proximately caused by the interference." *Meriden Med. Sys., LLC v. Epix Therapeutics, Inc.*, 2021 ME 24, ¶ 51, 250 A.3d 122.  The five elements necessary to establish interference by fraud[25] are:

> (1) mak[ing] a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or

---

[24]     I further note that the 2013 SSA "provides conditions for the use of discretion." *Spitzer Autoworld Akron, LLC v. FCA US LLC*, No. 1:2-cv-01755-PAB, 2023 WL 6809935, at *9 (N.D. Ohio Oct. 13, 2023) (applying Michigan law). It provides that Ford shall not "*unreasonably* with[o]ld" approval of a prospective purchaser. Ford Sales & Service Agreement ("**2013 SSA**") § 32 (ECF No. 65). This is another reason why the implied duty of good faith and fair dealing is inapplicable. *Id.*

[25]     The Plaintiffs do not appear to be arguing that Ford interfered through intimidation. *See* Am. Compl. ¶¶ 221–28; Pls.' Opp'n 27–28.

false (4) for the purpose of inducing another to act or refrain from acting
in reliance on it, and (5) the other person justifiably relies on the
representation as true and acts upon it to the damage of the plaintiff.

*Rutland v. Mullen*, 2002 ME 98, ¶ 14, 798 A.2d 1104 (quoting *Petit v. Key Bank of*

*Maine,* 688 A.2d 427, 430 (Me. 1996)). "When a claim for tortious interference is based

in fraud, it is subject to the heightened requirements of Fed. R. Civ. P. 9(b), which

generally requires the plaintiff to plead the 'who, what, where, and when of the

allegedly misleading representation.' " *Davis v. Theriault*, No. 1:22-cv-00275-JDL,

2023 WL 5628193, at *60 (D. Me. Aug. 31, 2023) (quoting *Fazeli v. Northbridge*

*Stroudwater Lodge II LLC*, No. 2:20-cv-00350-JDL, 2021 WL 1759860, at *10 (D. Me.

May 4, 2021)); *cf. Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985) ("Although state

law governs the burden of proving fraud at trial, the procedure for pleading fraud in

federal courts in all diversity suits is governed by the special pleading requirements

of Federal Rule of Civil Procedure 9(b).").

With respect to the tortious interference claims, the Defendant challenges the

sufficiency of the allegations that Ford interfered with the Membership Purchase

Agreement though fraud. MTD 19–21. Counts VI and VII rest on the allegations that

Ford misrepresented its franchise standards, misrepresented that Tucker met the

capital requirements, and acted in bad faith with respect to Tucker's attempt to

purchase Peggy and Eric's ownership interest in Casco Bay Ford. These claims are

dependent on the Plaintiffs' theory that Tucker did not meet the capital requirements

and that Tucker was never actually approved. The Plaintiffs have alleged that

McDonough lied when she testified that Tucker met the capital requirements and

lied when she testified that the amendment was approved by Ford (subject to the

closing). Based on my ruling on Count II, that the allegations do not support a claim of perjury, and based on my review of documents properly in the record, including the LOU that reflected Tucker's approved status for a Term Agreement, it becomes clear that the Plaintiffs have not plausibly alleged any "misrepresentations" by Ford. This absence is fatal to their tortious interference claims.

The only other allegations pertinent to the tortious interference claims revolve around FMCC employee Angela Story's representations that FMCC's Guaranty Termination satisfied Eric's release requirements. The Plaintiffs allege that Story gave a "Guaranty Termination" document to Peggy and represented "that a signed version of [the document] would be given to the parties at the closing, when Peggy and Eric would formally transfer ownership of Casco Bay Ford to Tucker." Am. Compl. ¶ 101. The Amended Complaint also alleges that Story told Tucker[26] that the Guaranty Termination was sufficient to meet Eric's release requirement. Am. Compl. ¶ 102. The Amended Complaint further alleges that "the Guaranty Termination, by its plain terms, would not have released any extant liability of Eric to FMCC." Am. Compl. ¶ 103.

These allegations are insufficient to support claims for tortious interference. Justifiable reliance is a required element of a tortious interference claim based on fraud. *Rutland*, 2002 ME 98, ¶ 14, 798 A.2d 1104. By its "plain terms," the Guaranty

---

[26]    Interestingly, the Amended Complaint does not allege that Story told Peggy that the Guaranty Termination was sufficient to meet the Release Requirement, although in a later paragraph, the Amended Complaint states: "[t]he representation made by Ford through FMCC's employee/agent, Angela Story, directly to Peggy and Tucker." Am. Compl. ¶ 103. Drawing all inferences in the Plaintiffs' favor, I will read into the Amended Complaint an allegation that Story falsely alleged to Peggy that the Guaranty Termination was sufficient to meet the Eric's release requirement.

Termination "would not have released any extant liability of Eric to FMCC," which contradicts Story's representation about what the document said. Am. Compl. ¶ 103. This sinks the Plaintiffs' tortious interference claims as they relate to the alleged misrepresentation to Tucker and to the extent they allege a false misrepresentation to Peggy, *see supra* n.26. The recipient of a fraudulent misrepresentation is "required to use his senses and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Restatement (Second) of Torts § 541, cmt. a. Here, any misrepresentation would have been uncovered by reading the relevant documents. Similarly, the Plaintiffs cannot show that they relied on any false representation by Story, because the Amended Complaint alleges that they realized that the release was not sufficient and they did not go forward with the deal. Am. Compl. ¶ 107.

On the facts alleged, the Plaintiffs have failed to state claims for tortious interference.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendant's motion to dismiss (ECF No. 50).

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 14th day of March, 2024.